UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 11bk12584 |
| | ) | |
| Michele A. Glenn | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| In re: | ) | Case No. 13bk13374 |
| | ) | |
| Michael R. Glenn, Jr. | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| Brian T. Sullivan, | ) | |
| | ) | Adversary Case Nos. 11ap01455 and |
| Plaintiff, | ) | 13ap00687 |
| v. | ) | |
| | ) | |
| Michele A. Glenn and | ) | Judge Timothy A. Barnes |
| Michael R. Glenn, Jr. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

TIMOTHY A. BARNES, Judge.

## MEMORANDUM DECISION

The matter before the court arises out of two complaints filed by Brian T. Sullivan ("Sullivan"), each seeking a determination of dischargeability of debt under 11 U.S.C. § 523(a)(2)(A): (1) against debtor Michele A. Glenn ("Michele") in adversary case no. 11ap01455 (the "Michele Adversary"); and (2) against debtor Michael R. Glenn, Jr. ("Michael," and together with Michele, "Debtors" or the "Glenns") in adversary case no. 13ap00687 (the "Michael Adversary," and together with the Michele Adversary, the "Adversary Proceedings"). The Adversary Proceedings were consolidated for trial and simultaneously tried before the court in a four-day trial. For the reasons set forth herein, the court holds that the debt is dischargeable by each of the Debtors.

This Memorandum Decision constitutes the court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). Separate Orders will be entered pursuant to Bankruptcy Rule 9021.

## JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code (the "Bankruptcy Code"). 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under title 11 of the United States Code, or arising in or related to cases under title 11. 28 U.S.C. § 1334(b). District courts may, however, refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy judge to whom a case has been referred may enter final judgment on any core proceeding arising under the Bankruptcy Code or arising in a case under title 11. 28 U.S.C. § 157(b)(1). A proceeding for determination of the dischargeability of a particular debt arises in a case under title 11 and is specified as a core proceeding. 28 U.S.C. § 157(b)(2)(I); *Birriel v. Odeh (In re Odeh)*, 431 B.R. 807, 810 (Bankr. N.D. Ill. 2010) (Wedoff, J.); *Baermann v. Ryan (In re Ryan)*, 408 B.R. 143, 151 (Bankr. N.D. Ill. 2009) (Squires, J.).

Accordingly, final judgment is within the scope of the court's authority.

## PROCEDURAL HISTORY

In considering the relief sought by Sullivan, the court has considered the evidence and argument presented by the parties at the four-day trial that took place from July 15, 2013 through July 18, 2013 (the "Trial"),[1] has reviewed the complaint in the Michele Adversary and the complaint in the Michael Adversary (together, the "Complaints"), the attached exhibits submitted in conjunction therewith, and has reviewed and found each of the following of particular relevance:

(1)  Michele's Answer to Complaint of Brian T. Sullivan To Determine Nondischargeability of Debt against Michele A. Glenn [Michele Adv. Dkt. No. 12];

(2)  Michael's Answer to Complaint of Brian T. Sullivan To Determine Nondischargeability of Debt against Michael R. Glenn, Jr. [Michael Adv. Dkt. No. 5];

(3)  Agreed Motion To Consolidate for Trial [Michele Adv. Dkt. No. 75; Michael Adv. Dkt. No. 12];

(4)  Order Directing Simultaneous Trial of Two Related Adversary Proceedings [Michele Adv. Dkt. No. 76; Michael Adv. Dkt. No. 15];

(5)  Amended Final Pretrial Order Governing Nondischargeability Complaint [Michele Adv. Dkt. No. 78];

(6)  Joint Pretrial Statement [Michele Adv. Dkt. No. 79];

---

[1]      At the Trial, Michael adopted all defenses set forth by Michele in the Michele Adversary as if they had been presented in the Michael Adversary.

(7) Debtors' Motion To Amend Pretrial Statement [Michele Adv. Dkt. No. 81; Michael Adv. Dkt. No. 16];

(8) Sullivan's Response and Objection to Debtors' Motion To Amend Pretrial Statement [Michele Adv. Dkt. No. 83];

(9) Orders Authorizing Debtors To Amend Pretrial Statement [Michele Adv. Dkt. No. 84; Michael Adv. Dkt. No. 17];

(10) Debtors' Proposed Findings of Fact and Conclusions of Law [Michele Adv. Dkt. No. 88; Michael Adv. Dkt. No. 18]; and

(11) Sullivan's Proposed Findings of Fact and Conclusions of Law [Michele Adv. Dkt. No. 89; Michael Adv. Dkt. No. 20].

The court has considered the procedural history and previous court filings in the Michele Adversary, including:

(1) Michele's Motion for Summary Judgment and related filings [Michele Adv. Dkt. Nos. 31, 32, 35, and 49];

(2) Response to Michele's Motion for Summary Judgment and related filings [Michele Adv. Dkt. Nos. 56 and 57];

(3) Sullivan's Motion for Partial Summary Judgment  [Michele Adv. Dkt. No. 37];

(4) Response to Sullivan's Motion for Partial Summary Judgment and related filings [Michele Adv. Dkt. Nos. 51, 53, and 61];

(5) Reply to Sullivan's Motion for Partial Summary Judgment [Michele Adv. Dkt. No. 60];

(6) Order Denying the Motion of Sullivan for Partial Summary Judgment [Michele Adv. Dkt. No. 69]; and

(7) Order Denying the Motion of Michele for Summary Judgment [Michele Adv. Dkt. No. 70].

Though the foregoing items do not constitute an exhaustive list of the filings in the Adversary Proceedings, the court has taken judicial notice of the contents of the dockets in this matter. *See Levine v. Egidi*, No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993); *Inskeep v. Grosso (In re Fin. Partners)*, 116 B.R. 629, 635 (Bankr. N.D. Ill. 1989) (Sonderby, J.) (authorizing a bankruptcy court to take judicial notice of its own docket).

## BACKGROUND

This case involves the failure of the Glenns' real estate business around 2007, when many such businesses were beginning to fail, and a loan that would prove to be an unsuccessful investment for Sullivan.

Michael and Michele Glenn are husband and wife and previously owned several entities that engaged in real estate development. In the fall of 2007, Michael sought a short-term loan for the business. He engaged the services of Karen Chung ("Chung"), who had previously procured loans for his business, to obtain a $250,000 loan. Chung approached Sullivan, her friend and someone with whom she had some business dealings, and eventually convinced him to provide the loan (the "Sullivan Loan").

Prior to making the loan, Sullivan met with Michael, Chung and Chung's employee, Adrian Lopez ("Lopez"). Michele did not attend the meeting. The central issue in this case concerns representations that were made at the meeting specifically in relation to a $1 million line of credit for the Debtors' companies, ostensibly to be obtained from LaSalle Bank (the "LaSalle Loan"). The Sullivan Loan may be characterized as a "bridge loan" – one intended to finance the Glenns' business until the LaSalle Loan was finalized, and which would be repaid from the LaSalle Loan itself. At the meeting, Chung and Lopez assured Sullivan that they had secured the LaSalle Loan, subject only to finalizing certain details. As separately established in Chung's bankruptcy case, Chung's representation regarding the existence of the LaSalle Loan was false. It was established in Chung's case that she committed fraud in obtaining the Sullivan Loan, which has not been repaid.

The issues also turn in part on a promissory note Sullivan required Michael, Michele and Chung to sign in connection with the Sullivan Loan, thereby agreeing to be personally liable on the loan. While Sullivan received a note bearing the signature of all three parties, Michele contends that the signature purported to be hers on the note is not authentic and not authorized.

In the Adversary Proceedings, Sullivan seeks a determination that the Sullivan Loan is not dischargeable pursuant to section 523(a)(2)(A) of the Bankruptcy Code because the debt was procured through fraud, false representation and false pretenses. There are essentially three issues before the court: (1) whether Chung's fraud should be imputed to the Debtors; (2) whether either of the Debtors independently committed fraud in connection with the loan; and (3) if Michael committed fraud or has Chung's fraud imputed to him, whether such fraud should be imputed to Michele.

## FINDINGS OF FACT[2]

From the review and consideration of the procedural background, as well as the evidence presented at the Trial, the court determines the salient facts to be as follows, and so finds that:

A. The Glenns and the Glenn Companies Business

    (1) The Glenns, who have been married to each other since 1990, previously owned a real estate development and investment business (the "Glenn Companies Business"), which was comprised of several limited liability companies that owned and developed real estate primarily in Illinois and Indiana (the "Glenn Companies"). The Glenn Companies Business

---

[2]    To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such.

ultimately failed in approximately 2010 due to an excessive debt load and rapidly declining commercial real estate values.

(2)   The Glenn Companies included 5M Investment Group, LLC ("5M"), which was the main investment vehicle for all of the real estate properties under development by the Glenn Companies Business.  As of November 1, 2007, 5M was owned by Michael, Michele and their three children, with Michele owning 24%, Michael owning 4% and their children owning the remainder in equal shares.  Michael was the only managing member in 5M and as such he controlled 5M as well as the entire Glenn Companies Business.[3]

(3)   At the time the Sullivan Loan was made, Michele was studying to be a nurse.  There is no credible evidence that Michele was involved in any aspect of the day-to-day management of the Glenn Companies Business or in fact had any knowledge of the real estate business generally, or as it pertained to the Glenn Companies Business.

B.   The Glenn Companies and Nomadic Consulting

(4)   At all relevant times, Chung was the president and a director of Nomadic Consulting Inc. ("Nomadic Consulting"), a corporation solely owned by Chung.  Among other things, Nomadic Consulting helped its clients obtain financing.

(5)   For several years, Chung had an agreement with the Glenn Companies whereby Chung would arrange debt or equity financing for certain Glenn Companies' projects.  This arrangement was originally negotiated between Chung and Michael, and over the years, the two worked directly with each other in managing and maintaining this arrangement.  Chung's role was to find individual and institutional parties willing to loan money to or invest in Glenn Companies' projects, and in return, the Glenn Companies would pay Chung a finders' fee for successfully arranging such financing.  From time to time, through and including November of 2007, acting on behalf of certain of the Glenn Companies, Michael engaged the services of Nomadic Consulting to procure funding for the Glenn Companies.

(6)   Michele did not personally have a relationship with Nomadic Consulting.  While Chung and Michele spoke several times on a social basis, the two did not discuss the business relations between the Glenn Companies and Nomadic Consulting.

(7)   Nomadic Consulting and the Glenn Companies entered into written engagement agreements in connection with some of the engagements by which Nomadic Consulting was retained to procure funding for the Glenn Companies.  The form of engagement agreement used by Nomadic Consulting was drafted by Sullivan while he performed legal services for Nomadic Consulting.

---

[3]   The Glenn Companies Business included companies in addition to 5M.  However, such companies are not relevant to this case and the court need not make findings of fact relating to such companies.

(8) With respect to the Glenn Companies' engagement of Nomadic Consulting to procure the Sullivan Loan, the Debtors produced an unexecuted copy of the form engagement agreement. DX 9.

(9) The unexecuted copy of the form engagement agreement and all prior agreements between the parties contain the following paragraph:

> Relationship to Client. Nomadic's relationship with Client and its role with respect to the Services is that of an independent contractor. Nothing herein is intended to create, or shall be construed as creating a fiduciary relationship between Nomadic and Client. Client agrees that Nomadic is engaged only by Client, and that Client's engagement of Nomadic, and Nomadic' (sic) Services are not being provided for, or on behalf of, nor are they intended to confer any rights (beneficial or otherwise) upon the directors, officers, employees, agents, lenders or shareholders of Client. Nomadic is not acting in the role of, and its Services specifically exclude those of a "broker," "dealer", "underwriter", "investment advisor", "loan broker," "business broker", "real estate broker", or "real estate agent", as these terms are defined under applicable state and federal laws.

PX 25; DX 9.

(10) Nomadic Consulting typically earned a ten percent finder's fee for arranging financing for the Glenn Companies. Chung's fee for procuring the Sullivan Loan was $25,000; however, the fee was never paid.

C. The Sullivan Loan and Representations Made in Connection Therewith

(11) In the fall of 2007, Michael engaged Nomadic Consulting to procure funding for the Glenn Companies. Chung approached Sullivan to see if he would be willing to make a short-term loan in the amount of $250,000 to Michael for use in the Glenn Companies Business. She explained to Sullivan that she had recently arranged bank financing for the Glenn Companies from LaSalle Bank, the proceeds of which would be available within a few weeks upon final approval, and would be sufficient to pay off the proposed loan from Sullivan.

(12) On October 31, 2007, Sullivan met with Michael, Chung and Lopez at Nomadic Consulting's office. This was the first time that Sullivan and Michael had met. The following representations were made at the meeting:

   a. Lopez represented that he and Chung had recently arranged and obtained approval of the LaSalle Loan, a $1 million line of credit from LaSalle Bank for the Glenn Companies Business, and that the only remaining step needed to draw on the funds was the execution of loan agreements and other documents, which LaSalle Bank was then in the process of preparing. Lopez also said that funds from the LaSalle Loan were expected to be available in a few weeks, which would be sufficient to repay the proposed bridge loan from Sullivan;

6

    b.  Michael represented that the Glenn Companies needed the Sullivan Loan and would use a portion of the $250,000 to finish grading and asphalt paving work, which needed to be done before cold weather set in, and also in order for certain development property to be ready for refinancing or sale by early spring of 2008. Michael explained that the remaining portion of the Sullivan Loan would be used as working capital in the Glenn Companies Business; and

    c.  Michael offered and agreed to pay Sullivan an interest rate of $5,000 per week on the Sullivan Loan for what was represented to be a two or three-week loan.

(13) At the meeting, Sullivan stated that he would only make the loan on the condition that both Michael and Michele obligate themselves to repay the loan and execute a promissory note to that effect. Michael agreed to this condition and told Sullivan that he would arrange to have Michele sign and execute the promissory note for the loan.

(14) At the meeting, Sullivan asked for the status of the LaSalle Loan. Lopez stepped out of the meeting room, purportedly to make a phone call to LaSalle Bank. He then came back and told Sullivan in Michael's presence that he had just spoken with a representative from LaSalle Bank who confirmed that the $1 million LaSalle Loan had been approved. Sullivan then spoke with Chung, who confirmed that the LaSalle Loan was approved. Sullivan told Chung that as a condition of making the loan, she too would be required to execute a promissory note and agree to be a principal obligor on the loan, to which she agreed.

(15) In reliance on the foregoing, and in consideration of the execution of the Glenn Note by Michael, the executed note from Chung and Sullivan's belief that Michele also executed the Glenn Note, Sullivan made the Sullivan Loan, the terms of which required repayment within 15 days. Although the Sullivan Loan was made to Michael individually, Sullivan and Michael agreed that the proceeds of the loan would be used in the Glenn Companies Business.

(16) The parties did not create any loan documentation and the signed promissory notes therefore stand as the sole documents controlling the Sullivan Loan. Given this lack of loan documentation, the parties disagree over who was actually the borrower of the Sullivan Loan: Michael claims that it was the Glenn Companies, while Sullivan claims that it was Michael. Given the existence of the promissory notes, it is unnecessary for the court to resolve this disagreement. The purpose of the Sullivan Loan was clearly for the Glenn Companies, but the promissory notes make the obligors thereunder liable for it.

(17) Accordingly, on November 1, 2007, Sullivan electronically transferred $250,000 to a 5M bank account designated by Michael. At that time, the 5M account had an overdrawn balance of $244,569.25 in its bank account, and the entirety of the Sullivan Loan was immediately applied to cover this overdraft. However, as Michael credibly testified, and as evidenced by Defendant's Exhibit 1, 5M had recently closed on a real estate transaction from which it was to receive $345,587.55, and the closing proceeds were intended to be used to cover the overdraft in the bank account. Michael explained that because Sullivan transferred $250,000 into the 5M account before 5M received its closing proceeds, Sullivan's loan proceeds were the first to become available to cover the overdraft. The November 2007 bank statement of 5M shows that when the closing proceeds actually

became available the following day, 5M had a balance of $351,008.30 in working capital. *See* DX 1.

(18) The Sullivan Loan was not repaid in 2-3 weeks as anticipated. There was a fair amount of back and forth between the parties about how this would be fixed, but ultimately the loan was not repaid, even in part.

(19) In December 2007 or early January 2008, contrary to the representations they made to Sullivan at the October 31, 2007 meeting, Chung and Lopez told Sullivan that the LaSalle Loan had not been approved by LaSalle Bank.

(20) In the fall of 2009, Sullivan learned from LaSalle Bank that neither Chung nor Lopez had ever applied for a line of credit with LaSalle Bank for the Glenn Companies. Thus, the representations that Chung and Lopez made to Sullivan at the meeting regarding LaSalle Bank's approval of the line of credit were false. Michael learned of these misrepresentations through Sullivan after Sullivan made the discovery.

(21) The Sullivan Loan and Chung's promissory note were the subject of an adversary proceeding filed by Sullivan against Chung in Chung's bankruptcy case in this District (Bankr. No. 08bk15443). Sullivan filed a complaint against Chung on September 12, 2008, objecting to her discharge of liability for four loans Sullivan made to her and others, one of which was the Sullivan Loan, on the basis that the loans were procured by her fraud (the "Chung Adversary") (Adv. No. 08ap00739). On May 18, 2010, after a three-day trial, Judge Doyle of this court ruled in favor of Sullivan, finding that the four loans, including the Sullivan Loan, were nondischargeable as to Chung pursuant to section 523(a)(2)(A) because they were procured through Chung's fraud. PX 15 (copy of trial transcript dated May 18, 2010, p. 54). Specifically, Judge Doyle determined that Chung made false representations with the intent to deceive that induced Sullivan to make the Sullivan Loan. *Id.* Judge Doyle made no findings with respect to the Glenns' participation in such fraud. However, she indicated that based on the facts before her, she believed that Michael and Sullivan were both deceived by Chung regarding the existence of the LaSalle Loan. PX 15 (p. 51).

D. Execution of the Glenn Note

(22) On November 1, 2007, Sullivan sent Michael an email with an attached promissory note, instructing Michael and his wife to each sign the note. PX 23. Approximately 25 minutes later, an email containing the executed Glenn Note and wiring instructions for the Sullivan Loan was sent to Sullivan from Michael's email account. *Id.* The email was sent from a computer at Michael's office in Illinois.

(23) Prior to the Trial, Michael asserted that his signature on the Glenn Note was his own but that Michele's signature on the note was not actually hers and that he did not know who signed her name. At the Trial, however, he testified that he did not think that he signed and emailed the Glenn Note because at the time the email was sent, he was in Portage, Indiana, which is a long distance from his office and would appear to make it physically impossible for him to have sent the email. He further testified that he did not know who sent the email, but that it is highly likely that he directed someone at his office to do so. He stated,

however, that he does not contest the validity of the signature of his name on the Glenn Note.

(24) Michael's testimony regarding the circumstances surrounding the sending of the email containing the executed Glenn Note was entirely lacking in credibility. His purported inability to recall any details regarding the sending of the email from his own account is simply not credible. Based on the totality of the circumstances, the court finds that either Michael sent the email or it was sent for him at his direction. In either case, Michael is responsible for the delivery of the Glenn Note to Sullivan via that email.

(25) Michele testified on May 9, 2011, at her first Meeting of Creditors in her bankruptcy case, that the signature on the last page of the Glenn Note above the printed name "Michele A. Glenn" is not hers and that she does not know who signed her name. This was the first time that Sullivan heard Michele deny that she signed the Glenn Note. She similarly testified at the Trial. Michael also testified at the Trial that the signature on the Glenn Note is not Michele's and that he did not know who signed her name on the note. The issue of Michele's signature on the Glenn Note will be further discussed below.

## APPLICABLE LAW

The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Goldberg Secs., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992); *Zamora v. Jacobs (In re Jacobs)*, 448 B.R. 453 (Bankr. N.D. Ill. 2011) (Sonderby, J.). A creditor must meet this burden by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *see also In re McFarland*, 84 F.3d 943, 946 (7th Cir. 1996), *cert. denied*, 519 U.S. 931 (1996). To further the policy of providing a debtor a fresh start, exceptions to the discharge of a debt are to be construed strictly against a creditor and liberally in favor of a debtor. *See In re Crosswhite*, 148 F.3d 879, 881 (7th Cir. 1998); *Meyer v. Rigdon*, 36 F.3d 1375, 1385 (7th Cir. 1994).

Section 523 enumerates specific, limited exceptions to the dischargeability of debts. Section 523(a)(2)(A) provides, in relevant part, that an individual debtor is not discharged from any debt:

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition….

11 U.S.C. § 523(a)(2)(A).

First, a plaintiff must establish that the debtor owes him a debt. *See Zirkel v. Tomlinson (In re Tomlinson)*, Nos. 96 B 27172, 96 A 1539, 1999 WL 294879, at *7 (Bankr. N.D. Ill. May 10, 1999) (Katz, J.). Second, a plaintiff must show that the debt falls within one of the specified grounds under section 523(a)(2)(A). *Wachovia Sec., LLC v. Jahelka (In re Jahelka)*, 442 B.R. 663, 668 (Bankr. N.D. Ill. 2010) (Goldgar, J.). Three separate grounds for holding a debt to be nondischargeable are included under section 523(a)(2)(A): false pretenses, false representation and actual fraud. *Id.*; *see also Deady v. Hanson (In re Hanson)*, 432 B.R. 758 (Bankr. N.D. Ill. 2010) (Squires, J.); *Bletnitsky v. Jairath (In re Jairath)*, 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001) (Goldgar, J.).

The Complaints allege claims under section 523(a)(2)(A) based on false representations, false pretenses and actual fraud under different theories of liability. The complaint in the Michele Adversary contains four counts, each pled in the alternative. Count I alleges that the debt was obtained by false statements, false pretenses and actual fraud of Chung and Lopez as Michele's purported agents. Count II alleges that Michele gave express or implied authority to her husband or another third party to execute the Glenn Note on her behalf. Count III states that Michele ratified her agreement to the Sullivan Loan and the Glenn Note, or is otherwise estopped from disaffirming such agreement.[4] Count IV alleges that Michael committed fraud and that as a purported agent of Michele, his fraudulent actions should be imputed to her. The complaint in the Michael Adversary contains two counts: Count I seeks to hold the Sullivan Loan nondischargeable on the ground that it was obtained by false statements, false pretenses and actual fraud of Chung and Lopez as Michael's purported agents, and Count II alleges that the Sullivan Loan was obtained by the false statements, false pretenses and actual fraud of Michael.

A. False representation and false pretenses

To except a debt from discharge under section 523(a)(2)(A) based on false pretenses or a false representation, the creditor must establish the following elements: (1) the debtor made a false representation or omission of fact; (2) which the debtor (a) knew was false or made with reckless disregard for its truth and (b) made with an intent to deceive; and (3) upon which the creditor justifiably relied. *Reeves v. Davis (In re Davis)*, 638 F.3d 549, 553 (7th Cir. 2011); *see also Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010); *In re Bero*, 110 F.3d 462, 465 (7th Cir. 1997); *Jahelka*, 442 B.R. at 668-69. A creditor must establish all three elements to support a finding of false pretense or false representation. *Ryan*, 408 B.R. at 156; *see also Rae v. Scarpello (In re Scarpello)*, 272 B.R. 691, 700 (Bankr. N.D. Ill. 2002) (Squires, J.). Failure to establish any one fact is outcome determinative. *Hanson*, 432 B.R. at 771 (*citing Jairath*, 259 B.R. at 314).

Under section 523(a)(2)(A), a false representation is an express misrepresentation that can be demonstrated either by a spoken or written statement or through conduct. *See Scarpello*, 272 B.R. at 700; *In re Philopulos*, 313 B.R. 271, 281 (Bankr. N.D. Ill. 2004) (Schmetterer, J.); *New Austin Roosevelt Currency Exch., Inc. v. Sanchez (In re Sanchez)*, 277 B.R. 904, 908 (Bankr. N.D. Ill. 2002) (Schmetterer, J.). As a spoken or written statement is not required for a false representation, "[a] debtor's silence regarding a material fact can constitute a false representation under § 523(a)(2)(A)." *Hanson*, 432 B.R. at 772 (internal quotation omitted); *see also Scarpello*, 272 B.R. at 700. "A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression." *Ryan*, 408 B.R. at 157 (*citing Trizna & Lepri v. Malcolm (In re Malcolm)*, 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992) (Wedoff, J.)).

---

[4]    Counts II and III of the complaint in the Michele Adversary are inadequately pled and fail to state a claim upon which relief may be granted. Such counts seem to exist to raise alternate theories under which Michele might be considered liable on the Sullivan Loan. Such liability is an element of a nondischargeability action, to be sure, and, despite its treatment of Counts II and III, pursuant to FRBP 7056 and FRCP 56(g), the court considers Sullivan's theories in considering Count I. However, Sullivan makes no claim in Counts II and III, such as a request for declaratory judgment, upon which this court could grant relief. The court therefore dismisses Counts II and III of the complaint in the Michele Adversary pursuant to FRBP 7012(b) and FRCP 12(b)(6).

In contrast, "[f]alse pretenses in the context of section 523(a)(2)(A) include implied misrepresentations or conduct intended to create or foster a false impression." *Media House Productions, Inc. v. Amari (In re Amari)*, 483 B.R. 836, 846 (Bankr. N.D. Ill. 2012) (Schmetterer, J.) (*citing Sterna v. Paneras (In re Paneras)*, 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996) (Squires, J.)). The implication arises when a debtor, with the intent to mislead a creditor, engages in "a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, ... or understanding of a transaction, in which [the] creditor is wrongfully induced by [the] debtor to transfer property or extend credit to the debtor...." *Paneras*, 195 B.R. at 406 (internal quotations omitted); *see also Amari*, 483 B.R. at 846.

A false pretense does not necessarily require overt misrepresentations. *Paneras*, 195 B.R. at 406. "Instead, omissions or a failure to disclose on the part of the debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Id.*; *see also Hanson*, 432 B.R. at 771 (finding that a false pretense is "established or fostered willfully, knowingly and by design; it is not the result of inadvertence").

An element common to a false representation and false pretenses is reliance. The United States Supreme Court has clarified that section 523(a)(2)(A) requires only a showing of "justifiable" reliance. *See Field v. Mans*, 516 U.S. 59, 73-75 (1995); *see also Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 673 (7th Cir. 1995). Justifiable reliance is a less demanding standard than reasonable reliance and "does not mean that [the creditor's] conduct must conform to the standard of the reasonable man." *Paneras*, 195 B.R. at 406 (*quoting Field*, 516 U.S. at 71). Rather, justifiable reliance "requires only that the creditor did not 'blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *Ojeda*, 599 B.R. at 717 (*quoting Field*, 516 U.S. at 71).

Whether a party justifiably relies on a misrepresentation is "determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff." *Id.*; *see also Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr. N.D. Ill. 2002) (Schmetterer, J.). "[A] person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Mercantile Bank v. Canovas*, 237 B.R. 423, 429 (Bankr. N.D. Ill. 1998) (Lefkow, J.) (*quoting Field*, 516 U.S. at 70). "However, a plaintiff may not bury his head in the sand and willfully ignore obvious falsehoods." *Johnston v. Campbell (In re Campbell)*, 372 B.R. 886, 892 (Bankr. C.D. Ill. 2007) (internal quotations omitted).

Several courts in this Circuit have determined that "[t]o satisfy the reliance element of § 523(a)(2)(A), the creditor must show that the debtor made a material misrepresentation that was the cause-in-fact of the debt that the creditor wants excepted from discharge." *Scarpello*, 272 B.R. at 700; *see also In re Mayer*, 51 F.3d 670, 676 (7th Cir. 1995) ("reliance means the conjunction of a material misrepresentation with causation in fact"); *Hanson*, 432 B.R. at 773. Accordingly, these courts have required the plaintiff to show that the debtor's conduct proximately caused the plaintiff's loss, thus making proximate cause an additional requirement under section 523(a)(2)(A). *See In re Luster*, 50 F. Appx 781, 784 (7th Cir. 2002); *In re Tomlinson*, 1999 WL 294879, at *7; *Microtech Int'l v. Horwitz (In re Horwitz)*, 100 B.R. 395, 397-398 (Bankr. N.D. Ill. 1989) (Katz, J.).

B. Actual Fraud

A different analysis is used when a creditor alleges actual fraud. In order to except a debt from discharge on the basis of actual fraud, a creditor must establish that (1) a fraud occurred, (2) the debtor intended to defraud, and (3) the fraud created the debt that is the subject of the discharge dispute. *Jahelka*, 442 B.R. at 669; *see also Ryan*, 408 B.R. at 157; *Scarpello*, 272 B.R. at 701; *Jairath*, 259 B.R. 308, 314. The fraud exception to the dischargeability of debts in bankruptcy does not reach constructive frauds, only actual ones. *McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000); *see also Ryan*, 408 B.R. at 157.

Unlike false pretenses and false representations, "actual fraud" does not require proof of a misrepresentation or reliance. *McClellan*, 217 F.3d at 892; *see also Jahelka*, 442 B.R. at 669; *Hanson*, 432 B.R. at 771. While there is no definite rule defining fraud, "it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *McClellan*, 217 F.3d at 893 (internal quotations omitted).

C. Intent

Scienter, or intent to deceive, is also a required element under section 523(a)(2)(A) whether the claim is for a false representation, false pretenses, or actual fraud. *Mayer v. Spanel Int'l, Ltd. (In re Mayer)*, 51 F.3d 670, 673 (7th Cir.1995), *cert. denied*, 516 U.S. 1008 (1995); *Pearson v. Howard (In re Howard)*, 339 B.R. 913, 919 (Bankr. N.D. Ill. 2006) (Schwartz, J.). Intent to deceive is measured by the debtor's subjective intention at the time of the representations or other purportedly fraudulent conduct. *See Scarpello*, 272 B.R. at 700; *see also CFC Wireforms v. Monroe (In re Monroe)*, 304 B.R. 349, 356 (Bankr. N.D Ill. 2004) (Schmetterer, J.). Subsequent acts of fraud or omissions do not demonstrate that the debtor had the requisite intent at the time the representations were made. *Standard Bank & Trust Co. v. Iaquinta (In re Iaquinta)*, 95 B.R. 576, 578 (Bankr. N.D. Ill. 1989) (Squires, J.).

An intent to deceive may be established through direct evidence or inference. *Monroe*, 304 B.R. at 356 (*citing In re Sheridan*, 57 F.3d 627 (7th Cir. 1995)). Because direct proof of fraudulent intent is often unavailable, fraudulent intent "may be determined from the totality of the circumstances of a case and may be inferred when the facts and circumstances present a picture of deceptive conduct on the debtor's part." *Cent. Credit Union of Ill. v. Logan (In re Logan)*, 327 B.R. 907, 911 (Bankr. N.D. Ill. 2005) (Cox, J.) (internal quotations omitted); *see also Hanson*, 432 B.R. at 773. Thus, "[w]here a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive." *Jairath*, 259 B.R. at 315.

D. Statements Relating to Financial Condition

Even in cases where all of the foregoing can be established, section 523(a)(2)(A) provides a safe harbor for statements relating to a debtor's or an insider's financial condition. 11 U.S.C. § 523(a)(2)(A). Specifically, this section provides that "a statement respecting the debtor's or an insider's financial condition" does not give rise to a finding of nondischargeability thereunder. *Id.* When read in conjunction with section 523(a)(2)(B), it is clear that such statements are only safe harbored if not in writing. Statements in writing are not safe harbored. 11 U.S.C. § 523(a)(2)(B); *see also Bednarsz v. Brzakala (In re Brzakala)*, 305 B.R. 705, 709 (Bankr. N.D. Ill. 2004) (Goldgar, J.).

Thus, any oral statements made by a debtor concerning the debtor's or an insider's financial condition do not form a basis for nondischargeability. *See Amari*, 483 B.R. at 848-49; *see also In re Bryson*, 187 B.R. 939, 960 (Bankr. N.D. Ill. 1995) (Schmetterer, J.) ("[I]t is improper to apply § 523(a)(2)(A) to false pretenses regarding a debtor's own or an insider's financial condition").

In *Stelmokas v. Kodzius*, the Seventh Circuit Court of Appeals noted "that a majority of the bankruptcy courts in this circuit have opted for the narrow construction" of what constitutes a statement respecting the debtor's financial condition under section 523(a)(2)(A), but did not decide the issue. 460 Fed. Appx. 600, 604 (7th Cir. 2012) (citing cases). The narrow view is that the "statement must paint a picture about the debtor's *overall* financial health, while the broad view encompasses statements of that nature along with any other that conveys significant information about debtor's finances." *Id.* at 603. The narrow construction limits the safe harbor to, for example, "statements concerning a debtor's (or insider's) overall net worth or earning capacity, or statements describing the overall economic condition of the entity." *Goldberg & Assocs., Ltd. v. Holstein (In re Holstein)*, 272 B.R. 463, 481 (Bankr. N.D. Ill. 2001) (Sonderby, J.). Another circuit has further reasoned that because oral communication "is often informal and spontaneous…it is logical to give more leeway (and more dischargeability) to a debtor who errs in stating his or her overall position orally…." *Cadwell v. Joelson*, 427 F.3d 700, 707 (10th Cir. 2005).

## DISCUSSION

None of the parties have raised the issue of whether this court has constitutional authority to enter a final judgment on all counts of the Complaints in light of the United States Supreme Court's decision in *Stern v. Marshall*, 564 U.S. ---, 131 S. Ct. 2594 (2011). This court has an independent duty to determine whether it has such authority. *Rutkowski v. Adas (In re Adas)*, 488 B.R. 358, 379 (Bankr. N.D. Ill. 2013) (Hollis, J.).

All of the counts in the Complaints are based on section 523(a)(2)(A) of the Bankruptcy Code. Section 523 is unequivocally a bankruptcy cause of action. While such actions may turn on state law, determining the scope of the debtor's discharge is a fundamental part of the bankruptcy process. *See Dietz v. Ford (In re Dietz)*, 469 B.R. 11, 20 (B.A.P. 9th Cir. 2012). As observed by one bankruptcy court, "there can be little doubt that [a bankruptcy court], as an Article I tribunal, has the constitutional authority to hear and finally determine what claims are non-dischargeable in a bankruptcy case." *Farooqi v. Carroll (In re Carroll)*, 464 B.R. 293, 312 (Bankr. N.D. Tex. 2011); *see also Dietz*, 469 B.R. at 20; *White Eagle, Inc. v. Boricich (In re Boricich)*, 464 B.R. 335, 337 (Bankr. N.D. Ill. 2011) (Schmetterer, J.).

Thus, even in light of the Seventh Circuit's later opinions regarding *Stern*, see *Wellness Int'l Network, Ltd. v. Sharif*, 727 F.3d 751 (7th Cir. 2013) and *Ortiz v. Aurora Health Care, Inc. (In re Ortiz)*, 665 F.3d 906 (7th Cir. 2011), the court concludes that it has constitutional authority to enter a final judgment in the Adversary Proceedings.

A. The Debtors' Liability on the Sullivan Loan

Before determining the issue of dischargeability, it must first be established that the Glenns in fact owe the underlying obligation. In other words, there must first be a debt to discharge. With respect to Michael, this conclusion is simple, as the parties do not dispute that he is liable on the Sullivan Loan. With respect to Michele, on the other hand, the parties disagree as to whether she is

13

liable on the debt, as the Debtors contend that Michele was not a party to the transaction, did not sign the Glenn Note or authorize anyone to sign on her behalf, and did not ratify her purported signature on the Glenn Note.  Other than through execution of the Glenn Note, Sullivan has advanced no theory under which Michele might be obligated to the transaction.

Sullivan has provided ample evidence refuting Michele's claim that she did not sign the Glenn Note.  Sullivan produced several notarized documents in connection with the Glenn Companies bearing Michele's signature.  *See* PX 49 (quit claim deed); PX 50 (specific power of attorney from Michele to Michael); PX 59 (specific power of attorney from Michele to Michael); PX 60 (specific power of attorney from Michele to Michael); PX 61 (warranty deed), PX 62 (limited power of attorney from Michele to Michael) (collectively, the "Notarized Documents").  These documents are of significance here because Michele's signature on the Glenn Note appears to be similar to the signature on the Notarized Documents.  Sullivan called two notaries public – Lisa M. Unzueta and Robert Romero – who testified that while they could not recall notarizing the documents bearing their signatures as notaries public, their signatures on such documents were authentic and that they would not have notarized a document containing a signature that was not made by the individual whose signature was being witnessed.  Michele, however, testified that the signature bearing her name on the Notarized Documents was not hers, and that she did not know who signed her name on those documents.

At the Trial, the Debtors sought to counter Sullivan's notarial evidence through Michele's and Michael's direct testimony in relation to the execution of the Glenn Note by testifying that Michele's signature on the Glenn Note is not authentic.  Sullivan objected, arguing that Illinois law provides that notarized documents preclude a challenge to the authenticity of the signature thereon by an interested party to the transaction.  *See Resolution Trust Corp. v. Hardisty*, 646 N.E.2d 628, 631 (Ill. App. Ct. 1995).  The court allowed the presentation of the evidence, subject to a later ruling on Sullivan's objection, on which it reserved judgment.  The court now sustains Sullivan's objection in that regard.

In Illinois, the act of notarization tends to prove the authenticity of the witness' signature.  *In re Koziol*, 603 N.E. 2d 60, 63(Ill. App. Ct. 1992).  The certificate of acknowledgment by a notary is "prima facie proof of the execution of the instrument."  *Krueger v. Dorr*, 161 N.E. 2d 433, 440 (Ill. App. Ct. 1959).  Where an instrument has been acknowledged by a notary, it may not be impeached except for fraud and imposition, and it is the party seeking to impeach such an acknowledgement that must do so by providing clear and convincing evidence coming from a disinterested witness.  *Hardisty*, 646 N.E.2d at 631.

The testimony of the Glenns, who are interested parties, is unsupported otherwise and does not overcome acknowledgment of the notaries on any of the notarized documents by clear and convincing evidence.  Absent such testimony, there is no credible evidence of fraud or imposition as there is no evidence that anyone else other than Michele signed her name on these documents.  Based on the foregoing, the court finds that the notarizations on the Notarized Documents prove the authenticity of Michele's signature on such documents.

Even absent such a ruling, the court has little difficulty concluding that Michele's signature on the Sullivan Loan is either Michele's authentic signature or was signed at her behest.  In this regard, neither Michele's testimony that she did not sign the Glenn Note nor Michael's testimony with respect to the delivery of the Glenn Note was credible.  Further, (1) the signature on the

Notarized Documents bears a noticeable similarity to the signature on the Glenn Note; (2) Michele represented that, at her husband's request, she previously signed promissory notes as a guarantor for loans provided to the Glenn Companies; and (3) Michele failed to deny that she signed the Glenn Note until the time of her 341 meeting in May 2011. Based on the foregoing, the court finds that the signature on the Glenn Note belongs to Michele.[5]

Even if the court were to conclude that Michele's signature on the Glenn Note is not actually hers, based on the relevant facts, the court would conclude that her husband (or someone acting at the request of Michele or her husband) signed the note under her express or implied authority. The email containing the Glenn Note was sent from Michael's email account, which indicates that Michael was involved in securing Michele's signature on the Glenn Note. As discussed above, Michael's testimony regarding the circumstances governing that email's sending was entirely lacking in credibility. The Glenns testified that in the past, Michael signed his wife's name on documents. Under such circumstances, if Michael signed Michele's name on the Glenn Note (or directed someone else to sign her name), his actions would have been made with Michele's actual or implied authorization. There is simply no credible evidence that suggests that Michele's signature on the Glenn Note is a forgery. Sullivan has established that Michele's purported signature on the Glenn Note is legally hers, thus making her liable on the debt.[6]

B. Dischargeability of the Sullivan Loan as to the Debtors

As noted above, having established that there is in fact a debt of each Debtor which might indeed be discharged, the court must now ask if such debt should be determined to be nondischargeable. Given that Sullivan predicates his Complaints on section 523(a)(2), this means that the court must find the existence of false pretenses, false representation(s), or actual fraud, 11 U.S.C. § 523(a)(2)(A), and find that such fraud is attributable directly or indirectly to the Debtors. *See Jahelka*, 442 B.R. at 668.

1. *Imputation of the Chung Fraud*

There is no dispute that the Sullivan Loan was procured through the fraud of Karen Chung, as this has been stipulated to by the parties and determined by Judge Doyle in the Chung Adversary. The question remains, however, whether that fraud should be imputed to the Glenns, and/or whether there exists an independent fraud to which the Glenns should be held accountable. The court will discuss each of Sullivan's theories in this regard, in turn.

Sullivan contends that because it has been established that the Sullivan Loan was procured through the fraud of Chung, the loan is also nondischargeable as to the Debtors pursuant to section

---

[5]       During his closing argument at the conclusion of the Trial, Sullivan stated for the first time that Michele probably did not execute the Glenn Note. As is discussed *infra*, Sullivan's beliefs regarding the nature of this transaction do not have bearing on the court's determination.

[6]       Sullivan has also made much of Michele's stake in 5M and the Glenn Companies Business so as to, presumably, show that Michele benefited from the Sullivan Loan. The court accepts that Michele, through her ownership stake in the businesses for which the loan was obtained, has benefited from the transaction. As she is directly obligated on the Sullivan Loan by way of the Glenn Note, no further inquiry in this regard is necessary.

523(a)(2)(A) without requiring any proof that either of the Debtors themselves committed or were complicit in the fraud in obtaining the loan. Sullivan purports to base this argument on the plain language of section 523(a)(2)(A), which he contends only requires that the debt be that of the debtor, not that the fraud be committed by the debtor himself. Although the court has already addressed and rejected this statutory construction argument in denying Sullivan's Motion for Partial Summary Judgment in the Michele Adversary, it will be briefly discussed again here.

Courts in this Circuit have observed that section 523(a)(2) "does not except from discharge every debt somehow connected with a fraud." *Jahelka*, 442 B.R. at 669; *see also Schatz v. Livermore (In re Livermore)*, Nos. 12 B 30720, 12 A 1689, 2013 WL 1316549, at *6 (Bankr. N.D. Ill. Apr. 3, 2013) (Goldgar, J.); *Wish Acquisition, LLC v. Salvino (In re Salvino)*, 373 B.R. 578, 588 (Bankr. N.D. Ill. 2007) (Wedoff, J.) (*citing In re Rountree*, 478 F.3d 215, 219 (4th Cir. 2007) (finding that "[a] plain reading of [§ 523(a)(2)(A)] demonstrates that Congress excepted from discharge *not simply any debt incurred as a result of fraud* but only debts in which the debtor used fraudulent means to obtain money....") (emphasis added)).

In similar fashion, the Ninth Circuit has recently determined that the exception to discharge in section 523(a)(19) applies only to debtors who have themselves violated the securities laws that caused the debt. *In re Sherman*, 658 F.3d 1009, 1014-15 (9th Cir. BAP 2011). In making that determination, the panel observed that in ensuring that the "honest but unfortunate debtor" receives a fresh start, exceptions to discharge of a debt under section 523(a)(2)(A) and (a)(4) are applied only in those cases where the debtor committed the fraud.[7] *Id.* The court sees no principled reason to treat section 523(a)(2) any differently than the Ninth Circuit treated section 523(a)(19). The Ninth Circuit's analysis itself makes clear the parallels between section 523(a)(2)(A) and (a)(19). Further, existing law in this Circuit in this regard runs contrary to Sullivan's interpretation.

Sullivan argues that a debt created by one party's fraud makes the same debt nondischargeable as to all those liable for the debt. Such an approach is contrary to the Seventh Circuit's tests for dischargeability under section 523(a)(2)(A). Taken to its extremes, Sullivan's argument would act as an absolute rule, barring discharge despite a debtor's innocence relating to the fraud. As discussed above, however, the standards established in this Circuit do not limit the determination to testing whether the debt was procured through fraud in general alone; rather, the requirement under section 523(a)(2)(A) is that the debtor himself acted with the requisite intent in procuring the debt by false pretenses, false representation, or actual fraud. Thus, the court rejects Sullivan's narrow reading of the statute.

There is in fact ample case law concerning dischargeability of debt procured through a third party's fraud, rather than that of the debtor, but that case law also puts paid to Sullivan's argument.

---

[7]      The *Sherman* court provided the following example, which is similar to the facts of the case at bar, in explaining the rationale of its decision: "Suppose...that a bank loaned money to an innocent person under the express condition that the loan be guaranteed by a third party who had greater assets. If the third party lies about his assets in order to qualify to be the guarantor, then the borrower will have, in effect, obtained 'money...by...false pretenses, a false representation, or actual fraud,' even if she did not know or have reason to know about the guarantor's misconduct. If she is subsequently unable to repay her loan and is driven to bankruptcy, we think it would contravene the 'fresh start' purposes of the system to deny her a discharge on the basis of a third party's misconduct." *Id.* This court agrees.

Under that body of law, courts have found the debt nondischargeable as to an innocent debtor if the plaintiff establishes that the fraudulent acts of a partner or agent of the debtor can be imputed to the debtor. *See, e.g., Casablanca Lofts LLC v. Abrham*, 436 B.R. 530, 537 (N.D. Ill. 2010) (imputing the fraud of a partner to the debtor); *Love v. Smith (In re Smith)*, 98 B.R. 423, 426 (Bankr. C.D. Ill. 1989) (imputing the fraud of an agent to the debtor). Sullivan's interpretation of the statute would render this Circuit's law regarding the application of agency and partnership principles in the context of section 523(a)(2)(A) meaningless, as under his theory, all fraud-related debt would be nondischargeable as to any innocent debtor.

Stated another way, what Sullivan wishes this court to adopt is a bright-line rule that a debt arising out of fraud is nondischargeable as to any party obligated on the debt, regardless of that party's complicity in the fraud. A party's innocence would be irrelevant. Not only does such a rule violate the fundamental precept of bankruptcy, to afford relief to the "honest but unfortunate debtor," *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934); *see also Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007); *Grogan*, 498 U.S. at 284 n. 11; *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 324 (7th Cir. 2012); *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011), but it runs contrary to the established case law in this arena noted above. This court has been unable to find a single court that has strictly applied section 523(a)(2) to a debtor found innocent of the fraud in question.

In *Stamat*, the Seventh Circuit noted in the context of section 727 that "[t]he Bankruptcy Code provides that a bankruptcy court 'shall grant the debtor a discharge,' but then lists several exceptions that deny the privilege of discharge to dishonest debtors." *Id.* at 978. This same principle has been relied on by the Seventh Circuit in considering exceptions to discharge under section 523. *In re Hudgens*, 149 Fed. Appx. 480, 483 (7th Cir. 2005).

The Supreme Court in *Grogan* inquired as to the nature of the fraud exception in section 523, and after examining its prior inquiry in *Brown v. Felsen*, 442 U.S. 127, 129-130 (1979), concluded that Congress' change of the term "judgment" to "liability" in section 523 was to include in the exception from discharge not just those debts for which a judgment of fraud had been obtained against the debtor, but to not allow "debtors facing fraud judgments to have those judgments discharged." *Grogan*, 498 U.S. at 290. In other words, Congress expanded the fraud exception from entered judgments alone to circumstances in which a judgment would be entered but had not yet been entered. Implicit in this conclusion is that it is the debtor who must face the fraud judgment, not simply some third party on a debt for which the debtor is also obligated. The Supreme Court made this clear when it referred to such debtors as the "perpetrators of fraud." *Id.* at 279, 287.

If the court were to conclude that an innocent debtor – one against whom a judgment would not be entered – is somehow now captured by section 523, that would be an extraordinary expansion of the scope of section 523 over that evidenced by the legislative history and the Supreme Court's analysis thereof, as well as extant case law to date.

This comports with the basic standards as well. As noted above, it is undisputed that a factor of nondischargeability under section 523(a)(2) is intent to deceive. As the Seventh Circuit in *Hudgens* made clear, absence of such an intent to deceive is a bar to finding a debt nondischargeable. *Hudgens*, 149 Fed. Appx. at 487. It is entirely possible, as this case demonstrates, that there can be two parties obligated on a debt – one of whom has requisite intent and one of whom lacks it. Without another reason to hold the party without intent liable for the fraud, the absence of intent must defeat a section 523(a)(2) claim.

17

It is therefore this court's conclusion that, should it find Michael or Michele innocent of the fraud in question and should it find no other reason to hold either or both of the Debtors to that fraud, the debt in question is dischargeable as to the innocent debtor.

The court therefore rejects Sullivan's "plain meaning" argument and will apply the well-established standards for dischargeability of debt. This does not suggest that Chung's fraud is irrelevant, as a creditor can rely on agency principles to impute an agent's fraud to a debtor. This theory alleged by Sullivan is discussed below.

2. *Alleged Fraud of Michael Glenn*

In Count II of the complaint in the Michael Adversary, Sullivan argues that Michael directly committed fraud, which renders the Sullivan Loan nondischargeable in his bankruptcy case. In Count IV of the complaint in the Michele Adversary, Sullivan contends that Michael's alleged fraud should be imputed to Michele, thereby making the loan nondischargeable in her bankruptcy case as well. Sullivan alleges three instances of fraud by Michael: (i) Michael represented the signature of Michele on the Glenn Note as being authentic when it was in fact forged; (ii) Michael knew or should have known that the LaSalle Loan did not exist but failed to correct the misrepresentations of Chung and Lopez; and (iii) Michael failed to disclose the intended use of the loan proceeds. The burden is on Sullivan to show that Michael directly or indirectly committed the fraud. Sullivan has failed to meet that burden.

a.   The Alleged Forgery

As to Michele's signature, Sullivan makes two opposing arguments. In the complaint in the Michele Adversary, Sullivan contends that Michele's signature on the Glenn Note is either hers or was made by an authorized representative. In contrast, the complaint in the Michael Adversary asserts that Michele's signature is a forgery and constitutes part of the claim under section 523(a)(2)(A). The parties have stipulated that Michele's signature on the Glenn Note was a condition precedent to the Sullivan Loan, and the court finds that by emailing the note bearing his signature and that of his wife to Sullivan, Michael represented that both signatures were valid. Because the court has already concluded that the signature on the Glenn Note belongs to Michele, Sullivan prevails on his argument that Michele's signature is legally hers, which forecloses his forgery claim.

While the Debtors apparently attempted to mislead the court with respect to the authenticity (or the authorization) of Michele's signature on the Glenn Note, such actions occurred years after the execution of the Glenn Note and the representations made in connection therewith, and are thus not relevant to the determination of dischargeability. *See Iaquinta*, 95 B.R. at 578 (subsequent acts of fraud do not demonstrate that a debtor had the requisite intent to deceive at the time the representation was made).

Thus, Sullivan has not shown and cannot as a matter of law show that Michael falsely represented the signature of Michele on the Glenn Note as being legally hers.

b.   Michael's Alleged Knowledge that the LaSalle Loan Did Not Exist

Second, Sullivan argues that Michael knew or must have known that the LaSalle Loan did not exist at the time that Sullivan made the loan because the financial condition of the Glenn

Companies was such that it would have been impossible to obtain a $1 million line of credit on behalf of the Glenn Companies. Sullivan contends therefore that Michael should have corrected Chung and Lopez when they claimed that LaSalle Bank had approved the fictitious line of credit.

In support of this contention, Sullivan points to his reliance on the existence of the LaSalle Loan. Indeed, at the October 2007 meeting, Sullivan spent little time discussing the financial condition of Michael or his companies, and seemed to be primarily concerned with whether the LaSalle Loan was approved. In response, Michael testified that he believed Chung when she claimed that she was successful in obtaining a line of credit for his business. He claims that he did not learn that the line of credit had not been approved until January of 2008, and that in the fall of 2009, he was shocked when he learned from Sullivan that at the time of the October 2007 meeting Chung had not even applied for the line of credit.

The problem with Sullivan's argument in this regard is that it is based entirely on conjecture. There is simply no evidence that Michael was aware of Chung's lie or even had reason to suspect that the line of credit was not obtained.

Contrary to its finding as to the testimony regarding Michele's signature on the Glenn Note, the court finds Michael's testimony regarding his lack of knowledge of Chung's fraud to be credible. Chung was previously successful in procuring loans for the Glenn Companies and even agreed to be personally liable on the Sullivan Loan, which Michael reasonably assumed she would not have done had the line of credit not been approved. Chung was friends with Sullivan and had worked with Michael for a number of years in procuring loans for his business – and there is no indication that she had previously lied to Michael or Sullivan.

Sullivan contends that Michael must have known that the LaSalle Loan did not exist because the Glenn Companies faced a "dire" financial condition. This argument is unpersuasive. Sullivan has not demonstrated that the financial condition of the Glenn Companies was so dire that a $1 million line of credit was inconceivable. The evidence merely showed that, as with countless other real estate companies at this time, the Glenn Companies were experiencing what appeared to be cash flow problems. The Debtors demonstrated that the Glenn Companies had a history of such financing, including that obtained on occasion through Chung's efforts. Though the use of such expensive, short term financing to overcome cash flow issues is of dubious business sense, its use is not conclusive of fraud. Where it otherwise, the entire payday loan industry would be criminal.

Further, while the court finds that Michael did not make any misrepresentations concerning the financial condition of his companies, as discussed above, any statements or omissions relating to the financial condition of Michael or his companies would be "explicitly exempt from the operation of section 523(a)(2)(A)." *Piekarczyk v. Nantz (In re Nantz)*, 44 B.R. 543, 545 (Bankr. N.D. Ill. 1984) (Eisen, J.); *see also Bryson*, 187 B.R. at 960. In addition, Sullivan misses the obvious point that a bridge loan – in this case putatively for two weeks – is most certainly to address cash flow issues. There is no other plausible short-term need that would necessitate such very expensive, short-term financing. Thus, the court does not find it of consequence that Michael did not inform Sullivan that in the fall of 2007 the Glenn Companies Business as a whole was having cash flow problems. That conclusion is tautologized from the nature of the transaction.

Under these circumstances, the court cannot conclude that Michael was aware or should have been aware of the lies of Chung and Lopez regarding the LaSalle Loan. Thus, he could not

have corrected Chung or Lopez when they lied about obtaining the LaSalle Loan. Sullivan has therefore failed to show that Michael knew, or that he should have known, that the LaSalle Loan did not exist at the time of the October 2007 meeting. The court concludes that like Sullivan, Michael was deceived by Chung and Lopez.

 c. Use of Loan Proceeds

  Finally, Sullivan argues that Michael defrauded him by failing to disclose the intended use of the Sullivan Loan proceeds, and that he would not have loaned the money to Michael if he knew that it would not be used in construction work. The parties have stipulated that Michael stated at the October 31, 2007 meeting that his companies needed the loan for working capital, and that a portion of the loan would be used to finish grading and asphalt paving work. Sullivan now appears to allege, however, that the main purpose of the loan was for asphalt work, and argues that the loan was actually used to repay existing debt of 5M. At the Trial, Michael testified that he represented to Sullivan that he needed the loan for working capital, denying that he ever represented the main purpose of the loan to be for asphalt work. Sullivan's shift in emphasis runs contrary to his prior stipulation.

  It is evident that the parties did not discuss the purpose of the loan with much specificity during their one and only brief meeting, but the parties have stipulated that it was intended to be used for working capital and some asphalt work. While the actual use of the entirety of the loan proceeds is not clear from the factual record, the court is satisfied by Michael's credible testimony that it was indeed used for working capital, with a portion going toward asphalt work. Thus, the loan was used for the stated purpose. Moreover, it is clear that the parties had a general understanding that the loan would be used in the business operations of one or more of the Glenn Companies, and that is how the loan was in fact used.

  Even if Michael had spent the loan proceeds on a project other than the one he proposed at the October 2007 meeting, this alone would not persuade the court that a misrepresentation occurred. For such a misrepresentation to have occurred, a promise must be made with the present intent not to perform, and Sullivan has failed to show that such intent exists here. *See Chriswell v. Alomari (In re Alomari)*, 486 B.R. 904, 912 (Bankr. N.D. Ill. 2013) (Schmetterer, J.). There is simply no showing that Michael lied about the intended use of the loan proceeds or that Sullivan relied on a representation that the loan would be used for specific construction work.

  As noted above, Sullivan makes much ado about the Sullivan Loan proceeds being used to cover an overdraft in the account in which they were placed. The testimony was that the Sullivan Loan covered the overdraft for just one day, because the Sullivan Loan proceeds were deposited into the bank account one day before $345,587.55 in proceeds from the closing of a real estate transaction were deposited into the same account, and it is these closing proceeds that were intended to cover the overdraft. Money is fungible, *In re Sheridan*, 57 F.3d 627, 636 (7th Cir. 1995), and it matters little that the exact money transferred by Sullivan was not immediately used for the stated purposes. The evidence shows that Michael made use of the Sullivan Loan in the required manner; thus, the overdraft issue is inconsequential.

  Altogether, Sullivan has failed to establish the existence of deceit, trickery, false representation, or omission of fact by Michael, and his claim would fail on this basis alone as failure to establish any element of a section 523(a)(2)(A) claim warrants denial of the claim. However, there

20

is also no sufficient showing of a requisite intent by either of the Debtors to deceive Sullivan, nor can intent be inferred based on the totality of the circumstances. The uncontroverted evidence is that both Sullivan and Michael were deceived by Chung with respect to the existence of the LaSalle Loan, which Michael and Sullivan believed would be available to repay the Sullivan Loan.

With respect to the fraud prong of section 523(a)(2)(A), while it is established that Chung committed fraud and that this fraud created the debt at issue, Sullivan did not show that the Debtors participated in the fraud, intended to defraud Sullivan, or that they were even aware of Chung's fraud. Similarly, the elements for false representation and false pretenses are lacking here. The Debtors did not make a false representation or omission of fact which they knew was false (or made with reckless disregard for its truth), with an intent to deceive, upon which Sullivan justifiably relied. Under these circumstances, the court finds that the Glenns did not obtain the Sullivan Loan through a false representation, false pretenses, or actual fraud under section 523(a)(2)(A) of the Bankruptcy Code.

In sum, the court finds that Sullivan has not established by a preponderance of the evidence that Michael or Michele obtained the Sullivan Loan from him by means of fraud, false pretenses, or a false representation.

3. *Agency Theory of Liability*

While the court finds that neither Debtor committed fraud directly or indirectly, this finding does not preclude Sullivan's agency theory of liability, which would render the debt nondischargeable if Sullivan can establish the existence of an agency relationship linking the Debtors to Chung or Nomadic Consulting. Sullivan argues that Chung was an agent of both of the Debtors, and that Michael was an agent of Michele. The court must independently consider these claims.

An agency is a "consensual fiduciary relationship between two legal entities whereby the principal has the right to control the conduct of the agent and the agent has the power to effect the legal relations of the principal." *In re Stoecker*, 202 B.R. 429, 456 (Bankr. N.D. Ill. 1996) (Squires, J.), *aff'd* Case No. 97 C 414, 1998 WL 641363 (N.D. Ill. Sept. 11, 1998), *rev'd on other grounds by* 179 F.3d 546 (7th Cir. 1999), *aff'd sub nom. Raleigh v. Ill. Dept. of Revenue*, 530 U.S. 15 (2000), (*citing Greenfield Direct Response, Inc. v. ADCO List Management (In re Greenfield Direct Response, Inc.)*, 171 B.R. 848, 855 (Bankr. N.D. Ill. 1994) (citations omitted)).

The determination of whether any party was an agent with respect to a transaction is a matter of state, not bankruptcy law. *In re Englewood Community Hosp. Corp.*, 117 B.R. 352, 359 (Bankr. N.D. Ill. 1990) (Squires, J.); *see also Butner v. United States*, 440 U.S. 48, 55 (1979) (stating that property interests are created and defined by state law unless a federal interest requires a different result).[8]

---

[8]        In cases where none of the parties argues for application of a particular state's law, the law of the forum state is presumptively applied. *Dean Witter Reynolds, Inc. v. Harrison*, 974 F.2d 873, 882 (7th Cir. 1992). Here, neither party has argued for application of a particular state's law, and each appears through citation and argument to presume that Illinois law applies. Illinois also appears to be the situs of the salient events in question. For these reasons, the court accepts that Illinois law governs this matter.

The Illinois courts have recently spoken to the nature of agency under Illinois law, as follows:

> In any agency relationship, the principal can be legally bound by action taken by the agent where the principal confers actual authority on the agent. Actual authority may be express or implied. Express authority is directly granted to the agent in express terms by the principal and extends only to the powers the principal confers upon the agent. Such authority may be granted through a written contract, a power of attorney or a court-ordered guardianship. Implied authority, on the other hand, is actual authority circumstantially proved. It arises when the conduct of the principal, reasonably interpreted, causes the agent to believe that the principal desires him to act on the principal's behalf.

*Curto v. Illini Manors, Inc.*, 940 N.E.2d 229 (Ill. App. 3rd Dist. 2010) (internal citations omitted). Absent express or implied authority (also referred to as actual or apparent authority), the principal may also be liable if the principal ratifies the agent's actions. *Stoecker*, 202 B.R. at 456 (*citing Anetsberger v. Metropolitan Life Ins. Co.*, 14 F.3d 1226, 1234 (7th Cir. 1994)).

The foregoing presumes, of course, that a principal/agent relationship exists, which the Glenns contest. This places the burden squarely on Sullivan, as, under Illinois law, "'[t]he burden of proving the existence of an agency relationship and the scope of authority is on the party seeking to charge the alleged principal.'" *Daniels v. Corrigan*, 886 N.E.2d 1193, 1204 (Ill. App. 3rd Dist. 2010) (*quoting Anderson v. Boy Scouts of America, Inc.*, 589 N.E.2d 892 (Ill. App. 3rd Dist. 1992)); *see also Powell v. Dean Foods Co.*, Case Nos. 1–08–2513, 1–08–2554, 2013 WL 3296568, at *31 (Ill. App. 1st Dist. June 28, 2013).

The key consideration in determining whether an agency relationship exists is whether the principal had the right to control the activities of the agent. *Stoecker*, 202 B.R. at 456 (*citing Oberlin v. Marlin Am. Corp.*, 596 F.2d 1322, 1326 (7th Cir. 1979)). Although existence of an agency relationship is a question of fact, it may be inferred from facts of a particular case. *Id.* (*citing Greenfield*, 171 B.R. at 855); *Lawlor v. North Am. Corp. of Ill.*, 368 Ill. Dec. 1, 14 (Ill. 2012) ("The determination of whether a person is an agent or independent contractor rests upon the facts and circumstances of each case."); *Pekin Ins. Co. v. Equilon Enters. LLC*, 366 Ill. Dec. 780, 792 (Ill. App. 1st Dist. 2012).

An agency relationship can be inferred from circumstantial evidence, including the situation occupied by the parties, their acts and other relevant circumstances. *Stoecker*, 202 B.R. at 456 (*citing City of Evanston v. Piotrowicz*, 20 Ill.2d 512, 518 (Ill. 1960)). "[T]he cardinal consideration is whether that person retains the right to control the manner of doing the work." *Lawlor*, 368 Ill. Dec. at 14 (internal quotation omitted).

However, when a question exists whether a person is an agent or an independent contractor – as is the case with Chung – "[c]ourts should also consider the following ...: (1) the question of hiring; (2) the right to discharge; (3) the manner of direction of the servant; (4) the right to terminate the relationship; and (5) the character of the supervision of the work done." *Id.*

The Illinois courts have described an independent contractor as follows:

An independent contractor is one who agrees to produce a certain result but who, during the actual execution of the work, is not under the control of the person for whom the work is done. An independent contractor may use his or her own discretion in matters that were not specified or in the details of the work. However, just because someone is an independent contractor will not bar vicarious liability, if he or she is also an agent of the principal. There is no precise formula for determining when a person's status as an independent contractor is negated by his or her status as an agent.

*Pekin*, 366 Ill. Dec. at 792 (citations omitted).

    a.   Chung as Michael or Michele's Agent

What is notably absent from the foregoing discussion is the matter on which the parties spent an inordinate amount of time at trial: the form of written agreement, if any, between the parties. Much time was spent on the nature of the parties' relationships based upon a putative, unsigned engagement agreement between Nomadic Consulting and the Glenn Companies (the actual record could not be located).[9] Given the extensive attention paid to this issue by Sullivan, it is worth considering for the moment the question of the agreement's alleged content and putative effect.

As adduced through the testimony of Michael, Chung and Sullivan, had there been a signed agreement, such agreement would state that Chung is an independent contractor. Chung testified that she used agreements containing the independent contractor language routinely and expected that she used just such a form of the agreement with Michael or the Glenn Companies. She explained that this was her practice and that she had done so on other transactions with the Glenn Companies. Michael testified that any agreement entered into by the parties would in fact contain such independent contractor language. Chung's and Michael's testimony was credible in this regard. The court therefore has no reason to doubt such testimony, and accepts it as true.

Sullivan, it happens, testified that he is the original draftsperson of the form engagement agreement used by Chung – at a time when the relationship between Sullivan and Chung remained good, of course. This, in fact, is where much of the parties' time was misspent. Sullivan attempted to use his role as the original draftsperson to persuade the court how to interpret the provision (should, of course, such an agreement containing the provision have existed and governed the engagement). Sullivan explained that his use of the term independent contractor was not meant to exclude that Chung could, in fact, later become an agent instead. He repeatedly emphasized that, should the nature of the work performed become more substantive, Chung would cease being an independent contractor and become instead an agent. For this reason, he testified, he did not expressly disclaim agency.

Sullivan appears to be advancing a theory under which he, as the original draftsperson but a non-party to the transaction, can dictate the effect of the provision. The Glenns appear to be advancing the theory that any ambiguity in the provision should be read against Sullivan, as the

---

[9]    Michael Glenn's testimony indicated that at some point prior to this litigation, a large portion of his business records had been lost when a storage unit where the documents were contained was auctioned.

drafter of the provision. In this regard, much of the time spent on this agreement by both of the parties was wasted, as both of the parties are mistaken in their understanding of Illinois agency law.

First, Sullivan misunderstands what it takes to be an agent under Illinois law. As noted above, it is the nature of control that most directly defines whether a relationship is that of principal and agent. *Oberlin*, 596 F.2d at 1326; *see also Stoecker*, 202 B.R. at 456; *Lawlor*, 368 Ill. Dec. at 14. Absent that, it is the hiring, firing, direction, termination and supervision that bears on the investigation. *Lawlor*, 368 Ill. Dec. at 14. Nothing in the foregoing analysis of Illinois law stands for the proposition that the labels used in an agreement are relevant.[10] The central point of the cases cited above is that the agency determination is one not governed by form but by substance. Further, no testimony was adduced by Sullivan that he presumed Chung was an agent because he knew the nature of the agreement. Sullivan never connected his presumptions relating to the agreement to his belief regarding Chung's role.

Second, to the extent probative at all, Sullivan's argument regarding Illinois agency law puts paid to his argument regarding the use of this provision. Sullivan testified that an independent contractor ceases being an independent contract and would instead be an agent if the nature of the work changes. Thus, under Sullivan's stated understanding, a party is either an independent contractor *or* an agent, and the triggering factor is the nature of the actions performed. Through his testimony, Sullivan made clear that the roles are mutually exclusive in his mind. Given such understanding, Sullivan's use of the term "independent contractor" in the agreement excludes agency. Were such labels persuasive, such a clear label would lend to the Glenns' point, not Sullivan's.

Third, and following closely on the heels of the preceding point, Sullivan's testimony regarding his motivation for drafting this provision was simply not credible. The term independent contractor appears to be used in the agreement precisely for the purpose of disclaiming agency. Not only was Sullivan's claimed motivation at odds with his espoused understanding, Sullivan's whole demeanor changed when addressing this point. While generally Sullivan was quite engaging and credible, at this point he was not. His testimony had the appearance of being contrived for the purpose of litigation, after-the-fact reasoning done to support the position he is taking in this matter. The court discounts it as such.

Last, notwithstanding Sullivan's motivation for drafting this provision, there is little effect of Sullivan's contrivance, as neither party is correct if they believe Sullivan, who is not a party to the engagement agreement, is afforded any presumptions regarding the drafting of the independent

---

[10] Of course, those labels may have bearing on the contractor's agent's authority as this is a question that can be shaped in part by third parties' perceptions, which in turn may be shaped by the contents of an agreement which such parties had seen. *Curto*, 346 Ill. Dec. at 233. But this is not a dispute that turns on Chung's authority to act. While Sullivan has contended that Chung was acting with Michael's authority when she misrepresented the existence of the LaSalle Loan to Sullivan, that is only partially true. The court accepts that Chung was within her authority – either as an independent contractor or agent – to make representations to Sullivan regarding her loan efforts on behalf of Michael. The court concludes, however, that she exceeded her authority when she chose to lie about those efforts. That lie does not have bearing on Chung's authority, which in turn is not indicative of Chung's status as either an independent contractor or an agent.

contract provision. This is not a matter of contract interpretation between parties, and no presumptions arise.

As previously noted, neither position need be adopted here, as the contents or interpretation of the engagement agreement provision is not controlling. The court accepts that the intention of the engagement letter, by its express terms, was to create an independent contractor relationship. The language of the agreement is plain and unequivocal in this regard.

That said, an independent contractor is not excluded from becoming an agent. *Lawlor*, 368 Ill. Dec. at 14 ("That someone is an independent contractor, however, does not bar the attachment of vicarious liability for his actions if he is *also* an agent.") (emphasis added). *Lawlor* makes clear that it is not the nature of the purported agent's actions that are the subject of the inquiry. An agent and an independent contractor may be indistinguishable at this level. Instead, it is the nature of the relationship of and interactions between the alleged agent and principal that must be examined.

In this instance, Sullivan paid very little attention at the Trial and in his pleadings addressing the relationship of and interactions between Chung and Michael. As the party bearing the burden of proof, *Dean Foods*, 2013 WL 3296568, at *31, Sullivan must do more. No evidence was adduced regarding how Chung was hired, when she could be discharged and the right to terminate the relationship. The draft engagement agreement that was produced addresses some of this, but to the extent that the unsigned agreement is in any way relevant, the relevant parameters contained within it are not inconsistent with the agreement's express designation of Chung as an independent contractor.

Of course, the engagement agreement is unsigned, so it is actually of little probative value except as to what form of agreement the parties may have entered into.[11] There was some testimony from Chung and Michael regarding the level of direction and character of supervision Chung was to receive, but not enough for the court to conclude that Chung was an agent of the Debtors, rather than an independent contractor. It is not enough that Michael was present during the performance of some of Chung's duties and had therefore the ability to observe and supervise Chung. It is the actual supervision that is at issue. Sullivan has failed to show that Michael in fact supervised Chung in the performance of these duties in a manner consistent with his theory of agency.

In fact, the bulk of the testimony regarding the *Lawlor* factors adduced at trial was that Chung was not the Glenns' agent. *See Lawlor*, 368 Ill. Dec. 1, 14. Michael's counsel was clearly well versed in the application of Illinois law to this issue, and targeted his questioning of Michael accordingly. Michael testified in response to very direct questioning that he did not direct, control or supervise any aspect of Chung's performance of her services. Michael's testimony was consistent and unwavering in this respect. Michael repeatedly disclaimed any control over Chung's actions. Michael appeared to sincerely believe that Chung could have controlled all aspects of the financing with LaSalle Bank up to signature without his participation. Michael's testimony regarding his

---

[11]     Equally lacking in probative value is Sullivan's attempt to procure in direct testimony an admission from Michael that Chung was Michael's agent. What constitutes an agent for the purposes of ascribing vicarious liability is a legal conclusion. As such, it is for the court to determine. Whether Michael, as a layperson, did or did not consider Chung to be his agent has no legal weight in this context.

relationship with Chung never faltered, and had all the hallmarks of reliability that other aspects of his testimony, discussed above, lacked.

As to Michele, Sullivan failed to connect her directly to Chung in any way, let alone a meaningful way.  No evidence was introduced as to any agency relationship between Chung and Michele.  Michele had no business dealings with Chung and she was apparently not a party to the missing engagement agreement.  Michele appeared to have only known Chung on a very limited social basis.  Under Illinois law, it is not the nature of the task to be performed that defines agency. It is how the agent is engaged and fired and how the agent is directed and supervised.  *Lawlor*, 368 Ill. Dec. 1, 14.  Nothing in this regard points to any such factors, as they pertain to Michele and Chung.  As the party seeking to ascribe an agency relationship to Chung and Michele, Sullivan bears the burden of proof, and has failed to carry that burden.

For these reasons, the court cannot conclude that Sullivan, as the party seeking to bind the Glenns to the acts of Chung, has carried his burden.  Chung was not Michael's or Michele's agent in this transaction.

b.  Michael as Michele's Agent

As to an agency relationship between Michele and Michael, it first must be noted that, having failed to establish an agency relationship between Michael and Chung, Sullivan's attempt to connect Michele to Chung through Michael as Michele's alleged agent is futile.  Further, as Sullivan has failed to show that Michael directly committed any fraudulent act, again, attempting to establish an agency relationship between Michael and Michele is also pointless.  What remains is the possibility that an agency relationship bears on whether Michael (or someone at his behest) signed Michele's name to the Glenn Note on her behalf.

As discussed above, the court has every reason to believe that this may have occurred, as it had occurred in previous transactions.  Having, however, already determined that the signature is legally Michele's, but that the circumstances of Michele's signature do not independently constitute grounds for a finding of nondischargeability, there remains no reason to pursue this further.[12]

4.  *Partnership Theory of Liability*

Sullivan also contends that Michael's alleged fraud should be imputed to Michele on a partnership theory.  For the same reasons stated above with respect to Michael as Michele's agent, there is little point to this inquiry.  There is simply no fraud committed by Michael or for which Michael must be held accountable to which Michele would be connected if this theory were successful.  As Michael did not commit fraud, there is no fraud to be imputed to Michele.[13]

---

[12]    The traditional agency tests of agency vs. independent contractor still apply with respect to the purported agency between Michael and Michele.  "[T]he status of husband and wife does not establish an agency relationship between the parties; mere proof of marriage does not prove that the wife was the husband's agent or servant."  *Galvan v. Allied Ins. Co.*, No. 2-12-0525, 2013 WL 1850793, at *8 (Ill. App. 2nd Dist. Apr. 30, 2013) (*citing Sumner v. Griswold*, 338 Ill. App. 3d 190, 197 (1949)).

[13]    Even were this theory viable, Sullivan has failed to carry his burden of establishing that a partnership exists.  In Illinois, a partnership is "an association of two or more persons to carry on as co-owners a business

## CONCLUSION

As noted above, Counts II and III of the complaint in the Michele Adversary are dismissed for failure to state a claim pursuant to FRBP 7012(b) and FRCP 12(b)(6).  As to the remaining counts and for the foregoing reasons, Sullivan has not proven his cause of action under section 523(a)(2)(A) and each of the Debtors' debt on the Sullivan Loan is therefore fully dischargeable.  Accordingly, judgment will be entered in favor of Michele on Counts I and IV of the complaint in the Michele Adversary and in favor of Michael on Counts I and II of the complaint in the Michael Adversary.

Separate Orders will be issued concurrent with this Memorandum Decision.

Dated: November 15, 2013

Hon. Timothy A. Barnes
United States Bankruptcy Judge

---

for profit." 805 ILCS 205/6(1).  To establish a partnership, a party asserting a partnership must show that the parties (1) joined together to carry on a trade or venture for their common benefit, (2) with each contributing property or services to the enterprise, and (3) having a community of interest in the profits.  *See Maloney v. Pihera*, 573 N.E. 2d 1379 (Ill. App. 5th Dist. 1991).  Whether Michael and Michele were partners in the real estate development business they owned is therefore a question of their intention to be determined from the surrounding facts and circumstances.  Sullivan argues that the Glenns are partners because they have an agreement or an intention to share profits of the Glenn Companies Business regardless of their percentage ownership interests in the Glenn Companies.  Little, if any, evidence was produced with respect to this claim.  The Glenn Companies are comprised of limited liability companies, and without evidence to the contrary, the Debtors are owners of these companies, and not partners.  As Michael did not commit fraud, his alleged fraud cannot be imputed to Michele.